IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 5, 2002 Session

## WESTERN EXPRESS, INC. v. BENCHMARK ELECTRONICS, ET AL.

Appeal from the Chancery Court for Davidson County
No. 01-1439-II    Carol McCoy, Chancellor

No. M2001-03151-COA-R3-CV - Filed January 23, 2003

Western Express, Inc. sued Benchmark Electronics Huntsville, Inc. for detention charges after Western's trailers were unreasonably detained at Benchmark's plant in Pulaski. The Chancery Court of Davidson County granted summary judgment to Benchmark, and Western asserts on appeal that the court erred in finding that the undisputed facts show that Western cannot prevail on its claims. We reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed in Part and Reversed in Part**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J. and JOHN H. GASAWAY, III, SP. J., joined.

Roland M. Lowell, Nashville, Tennessee, for the appellant, Western Express, Inc.

Brigid M. Carpenter, Nashville, Tennessee, for the appellee, Benchmark Electronics Huntsville, Inc. d/b/a Benchmark Electronics Pulaski.

## OPINION

Benchmark Electronics Huntsville, Inc. operates an electronic assembly plant in Pulaski. In early 2000 it had a contract to produce a product for Thomson Consumer Electronics in Indianapolis, Indiana. Some of the component parts came from a North Carolina company called Channel Master. Apparently for purposes of its own, Thomson arranged for the transportation of the component parts to Pulaski and of the finished product when it left the Pulaski plant. Thomson worked through Forsyth Transportation, Inc., a transportation broker, which placed the business with Western Express.

The problem of co-ordinating the receipt of the raw materials with the Pulaski plant's production schedule and Thomson's ability to receive or distribute the finished product caused some of the Western trailers to remain at the Pulaski plant for an extended period of time. Over a period

of months the detention charges amounted to more than $150,000. Thomson paid some of the charges, but when Western filed this action, approximately $54,000 remained unpaid.

Western sued Benchmark on multiple theories. The first two theories, stripped of their confusing verbiage, are that Benchmark was liable as the consignee on the bill of lading or as the party who benefitted from the detention. The third theory is that Western is a third party beneficiary of an agreement between Thomson and Benchmark that they would split the detention charges. The chancellor dismissed the complaint on all counts.

## II.

Since the trial court granted summary judgment to Benchmark, the case on appeal presents a pure question of law, which this court reviews de novo. *Lett v. Collis Foods, Inc.*, 60 S.W.3d 95 (Tenn. Ct. App. 2001). We must determine (1) whether a factual dispute exists; (2) whether the disputed fact is material to the outcome of the case; and (3) whether the disputed facts create a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993). When a party makes a properly supported motion for summary judgment, the burden shifts to the non-moving party to set forth specific facts by affidavits or other discovery materials showing that there are material facts in dispute. *Id.* at 215. The court must allow all reasonable inferences in favor of the non-moving party and disregard all countervailing evidence. *Downen v. Allstate Ins. Co.*, 811 S.W.2d 523 (Tenn. 1991).

## III.

Considering the first two theories, we are of the opinion that there are material facts in dispute that govern Western's ability to sustain these claims. As a general rule the person responsible for the detention is liable for the detention charges. *See* 13 Am. Jur. 2d *Carriers* § 521. In *Tennessee Central Railway Co. v. Cumberland Storage & Warehouse Co., Inc.*, 260 S.W.2d 208 (Tenn. Ct. App. 1953), a consignee was the agent of the shipper, acting to receive scrap iron for the shipper and to load it on a barge for further shipment. When the scrap iron arrived by railcar , a barge was not available, and the consignee refused to accept delivery. The railroad spotted the cars nearby and gave the consignee notice that a constructive delivery had been effected. When the barge arrived, the consignee accepted delivery and transferred the scrap from the cars to the barge. This court held that detention charges are part of the transportation charges and that the consignor is ordinarily liable for transportation charges. The court went on to hold, however:

> But the consignee may become liable for the charges. When he accepts the goods and the benefits rendered, the law implies a contract upon his part to pay the charges unless it appears to the knowledge of the carrier that he received the goods not as owner but as agent for another.

260 S.W.2d at 211.

The court held that the consignee was liable to the carrier, but the consignee was able to collect the detention charges from its principal "who accepted its service and the benefits of the transportation for which these charges are a part." *Id.*

We think the first theory in this case turns on the answer to this question: Whether Benchmark received the goods merely as the agent of Thomson and as an accommodation for it, and if so, was Western aware of that fact? The quantum meruit theory turns on the same question stated in a slightly different way: For whose benefit were the detention charges incurred?

Unless the shipper knows, or circumstances show that it should know, that the consignee received the goods not as owner but as an agent for another, an implied contract arises obligating the consignee to pay the detention charges. In the absence of a contract, if the shipper confers a benefit on the consignee which it would be unjust for him to keep without paying for it, the law implies a promise to pay the value of the benefit conferred. *See Swafford v. Harris*, 967 S.W.2d 319 (Tenn. 1998).

Benchmark produced the affidavit of its general manager in which he stated:

> 3. Benchmark filled purchase orders received from Thomson Consumer Electronics ("Thomson"). In doing so, it ordered component materials from Channel Master in Smithville, North Carolina. The materials ordered from Channel Master were custom components that would not have been ordered but for Thomson's order to Benchmark. The materials could not be used by Benchmark in other products if Thomson decided that it no longer wanted the final product it ordered. In fact, if Thomson changed its order so that the component material from Channel Master was no longer needed in a product assembled by Benchmark, Thomson was obligated to pay Benchmark for that material anyway. Thomson did so for some of the component material stored in the warehouse in the latter months of 2000.

> 4. Alan Bauer has stated that Benchmark ordered material early from Channel Master. However, Benchmark and Thomson agreed that Benchmark would order and receive the component material early based on Channel Master's limited production capacity to minimize change-over of Benchmark production lines. What happened is as follows: Thomson ordered approximately 30,000 units of a product called 4440s per month from Benchmark. Benchmark ordered the component elliptical dish for the 4440s from Channel Master. Channel Master could produce only 1000 to 1400 units per day, so that it took Channel Master approximately 21 days to complete production of 30,000 dishes. Although Benchmark could produce 30,000 units quickly (in 3 to 4 days if necessary), Benchmark had to change its production lines for that production, including changing test equipment and pulling different material. Therefore, Benchmark and Thomson agreed that Benchmark would change its production lines only once or twice per month so that Benchmark could have an efficient production run of 30,000 units per production run for the

4440s. Channel Master, however, did not have sufficient storage capacity to keep the 1,000 to 1,400 elliptical dishes it was producing every day, so they were shipped via Western Express every day, and then kept at Benchmark's facility until Benchmark needed them for production. This is the reason that the product was received by Benchmark in advance of lead times, and this arrangement was discussed with and agreed to by Thomson representatives, included Glen Ernst and Jim Supan, during the weekly conference call between Thomson and Benchmark regarding status of production.

5. Thomson directed Benchmark to procure warehouse space for the component materials. The reason that there was a delay in obtaining the warehouse space is because Alan Bauer of Thomson wanted to make a trip to Pulaski to inspect the various warehouse options. Mr. Bauer's trip got delayed, so Benchmark went ahead and rented the warehouse space, at the direction of Thomson. Thomson was billed for the amount of the entire invoice received from Appertain, the warehouse company. Benchmark did not pay for half of the warehouse space.

Western took the deposition of Alan Gene Bauer, Thomson's manager of quality assurance. He negotiated an agreement with the Benchmark employees about solving the detention problem. The negotiations took place by email and over the telephone. The deposition, in pertinent part, reads as follows:

Q. Okay. Prior to the June emails here, between June 23rd and June 26th that we've been discussing, had you had any previous discussion with Benchmark about the carrier's trailers being detained at Pulaski?
A. No. As I recall, my first becoming aware of this issue was on June 24th from Glen Ernst.
Q. Then your email of June 26th said to proceed with the warehouse rental. Who are you telling to proceed with that rental?
A. Responding to Jerry Ingle, Matt Mullins at AVEX.
Q. And did you determine, based upon their calculations that they represented to you that it would be a lot more cost effective to go ahead and rent warehouse space rather than detaining carrier trailers?
A. Correct. And, also, in this email you'll notice that I copied Norman Sandwell, also of AVEX. He's the plant manager for Pulaski, Tennessee.
Q. All right. Then on July 31st there's another email message. It looks like that's from you and, again, that was to Norman Sandwell whom you've just identified, is that correct?
A. Correct.

\* \* \*

Q. In this email of July 31st of 2000, what did you tell Mr. Sandwell?

A. In this note I'm asking him to confirm when they were going to rent the warehouse and unload the trailers, and further explaining to him that this would save his company, Benchmark, a lot of money in detention charges.

Q. All right. Then as far as the trailers at Benchmark, do you know if there were other companies' trailers being detained other than Western Express?

A. I'm not aware of any.

Q. The only ones you're aware of are the Western Express trailers, is that correct?

A. Correct.

Q. Now, back to the June 26th email. At 2:42 p.m., that one is from Jerry Ingle to you.

A. Yes, sir.

Q. There it's talking about depleting the inventory stored. Now, to me, inventory means it's not being currently used but is being held for production. Would that be accurate?

A. Yes, it would.

Q. And whose inventory would that be at that time?

A. This inventory belonged to Benchmark Electronics.

Q. And who would be in charge of doing the actual unloading of that inventory into the Benchmark facility when it's ready to be used for production?

A. Benchmark Electronics would do that.

Q. After the June and July emails, series of emails here, did Benchmark continue to utilize Western Express trailers for storage of inventory?

A. Yes, they did.

Q. Do you know at what point there was warehouse space?

A. The warehouse space we were told was immediately available so on my June 26th message we authorized them to move into that. July 31st I asked for a response back if they had completed that move and didn't receive anything. On September 22nd I, again, asked them to verify that they had moved into the warehouse.

Q. Did you get a response to your September 22nd inquiry about if they had moved into the warehouse?

A. Yes, they moved in later that week.

*   *   *

Q. Now, Thomson did agree to pay a portion of the detention charges, isn't that correct?

A. Yes, we did.

Q. And at the time you agreed – a maybe I'd better back up. Who is the person you agreed with? Was that Mr. Wise?

A. Wayne Wise?

Q. Yes.

A. I had a conversation with Wayne Wise. I believe I also spoke to Paul Wick and Andy Martin.

Q. At the time you agreed that Thomson would pay a portion of those detention charges, did you also agree that you would write him a letter stating the balance would be payable by Benchmark?

A. No.

Q. Was that your understanding that the balance was to be paid by Benchmark?

A. No, what we agreed to was that we were liable for part of it because we did change the production schedule. We would, therefore, pay a portion of that and the balance should be paid by whoever caused the detention, which was Benchmark Electronics.

We think these disputed facts are material to the dispositive questions raised in this case. Therefore we hold that summary judgment was improperly granted to Benchmark on the consignee and quantum meruit theories.

**IV.**

Western also sued Benchmark on a theory that Western was a third party beneficiary to an agreement where Benchmark agreed to pay part of the detention charges if Thomson would extend more favorable payment terms to Benchmark.

On this theory, Benchmark produced unequivocal proof that they did not agree with Thomson to pay part of the detention charges. Mr. Bauer of Thomson said:

> I had different conversations with Mr. Sandwell. The first one, according to this email, was that each of the parties pay $15,000. During that time he was agreeable to that but he would have to check with his boss. And then when Forsyth and Western didn't agree to pay 25 percent of those charges, that negotiation was over. Later, Thomson agreed to pay detention charges, which we did pay. That left a balance. We explained to Norman that that was his responsibility and he disagreed, saying that he felt that production schedule change is what caused those trailers to be held. On the third conversation we had with him they said that they had some working capital issues because they had to pay Channel Master for the dishes but they couldn't use them in their final product and charge Thomson for that, and if we would extend their payment terms to Thomson that they would consider paying the detention charges. Thomson did extend the payment terms t Benchmark but Benchmark didn't pay the detention.

We think the quoted testimony from M. Bauer fails to show an agreement that Benchmark would pay part of the detention charges. Taking the testimony as true, it only shows that Benchmark said it would consider the proposition. A mere expression of intent or a general willingness to do

-6-

something does not amount to an offer. *Jamestowne on Signal, Inc. v. First Federal Savings & Loan*, 807 S.W.2d 559 (Tenn. Ct. App. 1990).

Even if Western could show that the parties agreed, we think Western was at most an incidental beneficiary. Under Tennessee law an incidental beneficiary acquires no rights against the promisor or promisee. *Willard v. Claborn*, 419 S.W.2d 168 (Tenn. 1967). The assorted agreement was not for Benchmark to satisfy some duty of Thomson to Western, a requirement to make Western a creditor beneficiary. *Id.* Thomson stoutly denies that it had any further duty to Western. In fact Western takes the same position. Therefore the agreement with Benchmark would have been strictly a private adjustment of their relationship.

We reverse the judgment below in part and affirm in part. Remand the cause to the Chancery Court of Davidson County for further proceedings. Tax the costs on appeal equally to the parties.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.